Good morning, everyone, and welcome to the Ninth Circuit. We have, I believe, four matters on calendar today for argument. As I always say when we're before the Ninth Circuit, there is no extra credit or bonus points for using all of your time. So if you make your points and you're not getting any questions back, nothing wrong with sitting down. And with that, I'll call the first case, United States v. Harder. Counsel, you may proceed. Good morning. Because time is short, I want to start off with an issue. State your appearance, please. Alex Kuczynski. Thank you. Laura Pellant. John Harder. Thank you. I want to start with an issue that I think categorically precludes affirmance here. It requires at least a remand and possibly more. As the Court knows, there were $154 million of expenses spent by the receiver in this case. There were numerous claimants. Some of them were MRVRA victims, but a substantial chunk, perhaps as much as a third or maybe more, were not. There's no theory under which John Harder should be charged for expenses, receivership expenses, that were devoted to claimants who are not MVRA victims. We raised this in our brief on page 59. The government has not responded and therefore has waived the issue. Just gave no response at all. Counsel, let me ask you a question. My understanding of the restitution award is that it essentially awarded the victims the amount of money that they invested in one of the three ways. That's right. All right? And so when the receiver and the forensic examiners went through all the records and so on, they determined what portion of the expenses had originally been allocated and reduced the amount. So that, in essence, what the victim is getting under the restitution order is no more than what he or she invested. So is your argument really you're entitled to a credit for the $155 million? Absolutely. I think we're entitled to the entire $155 million, and that is our argument under LOMO, which is circuit law binding on this panel. But aside from that, this was a giant enterprise, the receivership. It served the MVRA claimants, but there were other claimants, as much as a third or maybe more, that were not. This was a machine that was there to benefit various kinds of- Well, the problem is that we have multiple, I don't want to call them victims because that's not right, multiple claimants. That's right. In the two bankruptcies, the corporate bankruptcy and the personal bankruptcy, and those expenses were basically, as I understand it, incurred in trying to determine the legitimacy of the various claims that had been submitted. So clearly he would not be entitled to the entire $155 million because many of those claims would have been, for example, banks that lent money to SunWest, and they are not the victims of the fraud, as I understand it. I'm talking about claims of investors. Right. There were investors who were- I'm treating the bank claims and lenders and so on as expenses of their estate. Yeah. But there were people who actually had claims as investors. Some were MVRA victims. A substantial amount were not, and their estate was operated for the benefit of all of them. There's no theory on how they should be charged for the expenses of running their estate for the benefit of non-MVRA victims. But in a normal bankruptcy or receivership, the race, the bankrupt estate, is properly charged with the expenses of administration, is it not? That's right. Well, the government did not respond, and therefore under this court's case law, De Leon v. Garland, United States v. Dreyer, it has waived their argument. Well, I'm not sure about the waiver, but I am concerned about the fact that, as I understand it, there were 25,000 man hours that went into the creation of Courts Exhibit 1 through version 7 in order to try and determine how much each individual investor had invested and how much money had been returned to the investor, and then a restitution award was entered for the difference between what the investor had invested and what he had received. So I'm still trying to figure out— Well, but again, there were investors who were not part of the MVRA class. So all this work that was done benefited all investors, a third of which, something like a third of which were not MVRA investors. There is no justification, there's no theory under which HARDA should be charged for servicing those investors. It's in our brief— Wouldn't that be a consequence of the fraudulent scheme that he set in motion by violating the law? It is true, and many other people were hurt as well. But the MVRA limits compensations to expenses and to losses directly caused by the defendant. But again, the restitution award is entered to make the investor whole, to return—let's say it's $100,000. And my understanding is that they paid back ultimately $0.76 on the dollar, right? So $76,000 went back to the investor, and then a restitution award was entered for the difference, the $24 million between $100,000 and $70,000. Remember, John HARDA gave over a billion dollars to this estate to make it whole. Judge Hogan, who supervised the estate, praised him. I mean, he came clean. He made some mistakes. He gave his entire interest, 75 percent of the interest he gave to the estate for the benefit of the debtors—of the investors, rather. So there were expenses afterwards, but there were people who benefited who were not MVRA victims. He shouldn't be charged for the expenses of servicing—of returning their money. The expenses would be properly chargeable to the bankrupt estate, would they not? That's right, and allocable to the non-MVRA victims. He should only be charged for the expenses, if at all, expenses for the MVRA victims. Because time is short, I think I've said what I can say about this, I want to move to the Lamo issue. This court in Lamo said categorically that expenses of running a receivership are not directly caused by the—are not a direct result of the offense conduct. And this is not—this was an outlier. This was a case that relies on a strict reading of directly caused, going back to at least 1986 to a case by the name of Kenney. And if you follow Kenney, it goes back even further than that. And what this court said is we construe directly caused by the offense strictly, and it says the district court may order restitution only for direct losses caused by Lamo's fraud, and the receiver's expenses are not part of the funds fraudulently diverted by Lamo's scheme. It is circuit law. It is binding on this court. The government has not offered a Miller v. Gama analysis to explain why this panel is free to disregard it. And, in fact, it's not free to disregard it. The language that Lamo interpreted and the prior cases, and there are dozens of them going back to at least 1986 or 1985, is exactly the same under the old sentencing statute as a new one, as MVRA. What Congress did is it took the language from the old prior sentencing statute, moved it around, incorporated it, but the language is absolutely—if you compare it, and I have a comparison, I've done a comparison, and it is absolutely word for word the same. So what Lamo says is you cannot—the receivership expenses are not directly attributable. It's binding on this panel. Now, the government, and I think the district court, said, oh, well, but this new statute has a new philosophy. It's supposed to help victims. But the Supreme Court rejected exactly that argument in Lagos. The government made the same argument in Lagos, the United States Supreme Court, and said, well, if you construe the statute—if you don't construe the statute broadly, then some victims won't get reimbursed or won't get reimbursed enough. And what the Supreme Court said was broad general purpose of this kind does not always require us to interpret restitution statute in a way that favors our word. It rejected that argument. Again, if this court is thinking of departing from Lamo, which I think is binding, it needs to do a Miller v. Gamme analysis, and if you do a Miller v. Gamme analysis, you'll be looking at overturning a line of precedent going back 85—well, I remember 85. Forty years? Forty years. Forty years. At least 40 years. It's unwise to do so. The government has not offered a Miller v. Gamme analysis. One final point. I know I'm over my time, and Judge Owen, I want to clarify. This is on the question of who has the burden on showing prejudice. And there was a dispute with the government as to the meaning of McIntosh, a Supreme Court case, McIntosh, that says that in this kind of case, in a time-related directive kind of case, it gets reviewed on appeal under Rule 52A, harmless error principles. And we think that applies in the trial court as well. The government says no, only on appeal. But it doesn't matter, because I have gone back and looked at what this court has said about harmless error review. And if you go back to Judge Kleinfeld's opinion in a case by the name of Mitchell, United States v. Mitchell— and I'm sorry, I found this preparing for oral argument, but it is— and it references a case with Dusside, which is O'Neill v. Anich, Supreme Court case. And what the panel there—and this is United States v. Mitchell, 172 Feds 3rd, 1104. And what the panel says is this court, the court of appeals, needs to be convinced, needs to be convinced that the error is harmless. No deference to the district court. Breyer. Well, I thought the district court made that determination after a two-day evidentiary hearing. Sotomayor. You have to be convinced. That's what— Breyer. There was an evidentiary hearing on that issue. Sotomayor. There was an evidentiary hearing. Breyer. And the court made a specific factual finding. Sotomayor. That's right. Breyer. There was no prejudice. Sotomayor. We disagree with that. We think it's unfounded. But it doesn't matter because on appeal, you—this panel needs to be convinced that, in fact, the error is harmless. That's what circuit law says, United States v. Mitchell. No deference to the district court. You have to look at the record, and that's what Justice Sotomayor said in McIntosh. On appeal, it is governed by harmless error principles. Breyer. Thank you, counsel. Sotomayor. And Judge Owens is looking— Breyer. Yep. Sotomayor. I know that look. Breyer. Appreciate it. Sotomayor. I am going to—if the panel wishes to give me a minute for rebuttal, I'll take it. Breyer. Well, we'll see. You're almost five minutes over. Counsel. May it please the Court. Katie DeVilliers for the United States. This panel can confidently affirm the district court's second amended judgment finding a restitution amount based on two critical concessions made by the defendants and one important finding of fact by the district court. I'll start with those two concessions by the defendant because they bookend the restitution proceedings below. In his very first filing in June of 2021, after the government discovered its omission, the defendant conceded that this delay in finalizing restitution was due to negligence and nothing more. And that was supported by the fact that this receivership had been making distributions for three years after sentencing and also supported by the fact that both criminal AUSAs and all but one of the agents who worked on the federal prosecution had left government service before the defendant's sentence was commuted. There was therefore no reason for the district court to have further developed the record on that point. We're all here today still because of that mistake and not for anything more egregious. The second concession that the defendant made that's very important was captured by the district court in its October 2023 order providing for a restitution amount at ER 20 where it noted that by the time of the evidentiary hearing, Mr. Harder did not challenge the accounting accuracy of any details in the government's victim list and MIMO spreadsheet. And that's very important for this panel because, of course, this court needs to review de novo the accounting accuracy of that restitution spreadsheet. The defendant has already conceded that that version 7 of the MIMO spreadsheet is what it purports to be. In other words, that it accurately captures the amount that those 1,488 victims invested minus the amount they have gotten back from the four distributions that the receivership made and therefore captures that the defendant, Mr. Harder, still owes those 1,488 victims $74 million. I'll move now to the most important finding of fact that the district court made when it provided the restitution amount. And that is that these 1,488 victims invested cash with SunWest and not real property. That's crucial. The rest of the restitution judgment flows from that finding of fact. And that's for three reasons. First of all, it simplifies this Court's application of the MVRA for this case. We are operating under subsection B1A, which simply requires that a defendant needs to return the property to the owner. And Robers, the Supreme Court in Robers and this Court as recently as Holmes in February of this year have clarified what that means. When an investor has invested cash, he needs to get that cash back. End of story. There is no reason for this Court or for the district court to have moved on to subsection B1B, which goes through a valuation method if return of that property under subparagraph A is impossible, impracticable, or inadequate. It's not impossible here. They invested money. They need to get their money back. My opponent has dismissed the Holmes case in a footnote in his reply. That's simply not appropriate. Those investors in Holmes similarly put their money into Theranos. They got back shares of Theranos. And the defendant there tried to argue what they've lost is the value of their shares in Theranos. This Court disagreed. What they lost was the money that they put into Theranos. What these 1,488 investors lost is the money that they turned over to John Harder. The second reason that that finding of fact is so important is because it shows why Mr. Harder's most compelling prejudice argument here, the destruction of some of the documents as part of the receivership, just holds no water. He was not prejudiced by the destruction of those documents. And we know that because even for those 103,000-some files that still existed that were in Mr. Winkler's possession after the destruction of those documents, the district court quashed those subpoenas, finding that all of the reasons that the defendant wanted to examine those documents were irrelevant. He wanted to conduct valuations of various SunWest properties at various points in time. But again, under Robers, under Holmes, that just doesn't matter. The third reason that that finding of fact regarding these investors investing cash is so important is because it also demonstrates why this argument about the $155 million in receivership fees fails. Those victims didn't receive any portion of that money. It went to paying that staff of 25 who spent 10 years fixing the enormous mess caused by Mr. Harder's fraud. It went to feeding residents, to keeping the lights on. It went to paying non-victim investors, those people who invested in SunWest but outside the timeframe found by the district court for investors who qualified as victims, only those between January of 06 and July of 08. I take issue with my opponent's suggestion that the government did not respond to this argument about the $155 million in fees. There's a lengthy discussion about that in the government's brief and an explanation why the victim simply should not bear the cost of that. The only case that my opponent can point to here is Lamau. And there are a number of reasons why that is distinguishable. First of all, the facts there did not arise under the MVRA. The restitution order in Lamau was ordered under 3663 that preceded the MVRA. And that's important because even though the language is very similar, as the Supreme Court found in Dolan, that prior restitution statute, this is a quote from Dolan at page 612, left restitution to the sentencing judge's discretion. There is no longer any discretion when it comes to ordering restitution under the MVRA. We know that because of the M in MVRA. It's mandatory. There is no discount for the cost of receivership. There's nothing like that that could be done, like could be done in Lamau. Lamau was also factually distinguishable because it was the receiver who was being treated as the victim, essentially. And that receivership had arose subsequent to a prior state court civil proceeding. Here, and I think Judge Tolman was you, was pointing out that the receivership was a consequence of Mr. Harder's fraud. That is also a finding of fact that the district court made at ER 26. It found that this Harder's fraudulent sale of investments in the SunWest assisted living facilities and his related co-mingling and diversion of investor funds caused SunWest to fail and caused the subsequent receivership. A receivership was the only way to marshal the assets of a nationwide multi-million dollar company and sell them to compensate the victims of Mr. Harder's massive fraudulent scheme. Mr. Harder did benefit from the receivership here. He benefited from that $155 million that was spent on professionals, keeping the lights on, feeding the residents, selling properties to compensate his investors. That's why he was able to commit a nearly $300 million fraud scheme and be ordered to pay only $74 million in restitution. Because that receivership was so successful, those investor victims have already been paid back about 76 cents on the dollar. The restitution order captures the remaining 24 cents on the dollar that those 1,488 victims must be paid. Unless this panel has any questions, I'll submit. Thank you, Counsel. We'll give you one minute for rebuttal. We do not dispute the bottom line once the calculations are made, and Counsel is correct. We do dispute the process by which the bottom line, those figures were acquired. But he had Counsel who represented him in the receivership proceedings, did he not? That's right, he did, five years earlier. He had the opportunity to review all the records that you're complaining about and make appropriate objections to the computations in Courts Exhibit 1 that you're now challenging. And why hasn't that argument been waived as a result of the fact that he fully participated? Well, he didn't have the same incentives or the same reasons for challenging. He knew when he was sentenced that a mandatory restitution order was going to be in. I'm not talking about challenging whether monies were spread out. I'm talking about the question of where things entered correctly, where they're allocated to the right... I guess what I'm questioning is why would the motivation be any different if he knew from the get-go and was represented by Counsel that if he had a dispute about how the monies, the cost of the receivership were being established, that was the time to challenge those computations? Well, those computations were... I mean, he didn't challenge a person's receivership. He had been told that a restitution hearing would be five years earlier. And he was entitled to rely on the fact that the government never raised it, the court never raised it, and not... counting on not having to answer for them. We have... but aside from the delay itself, we got no information at all from the government. They put together this spreadsheet. They had Mr... You're saying that now, but he was represented by Counsel at that time that this exhibit was created. So to the extent that he has an objection, that was the time to raise it, not now. The exhibit was revised a number of times, and Counsel, without benefit of the records, didn't even have the records that the government has. The government provided nothing by way of records, any way for us to check. But the response to that is to go to the court and say, we want these records. We did. We issued subpoenas. And if he felt he wasn't getting access to the records that he needed, all he had to do was go to Judge Hogan and say, the receiver is not giving me the documents that I want to look at. But by the time the residual proceedings started, all those records were gone. But then, now we're back to my concern about what's the difference in the motivation between then and now? He still has an interest as an interested party in the receivership. Well, he gave over his property. Legitimately calculated. He gave over his property. There was nothing else for him to give in the receivership. So his interest in micromanaging the receivership was not, he wasn't going to be tagged with anything else. He could count on the fact that there was no restitution hearing for five years. It only happened after President Trump commuted his sentence. And then probation contacted the U.S. Attorney's Office and said, we want to set up a restitution hearing. Well, we don't know. Somebody said, oh my God, restitution. What happened to restitution? We don't know what happened, but we do know that it's a five-year delay. It was negligence on the part of the government. It was negligence. We're not disputing. It was negligence. And I had one other point, but I think, as far as Lameau is concerned, is what matters is not all that other stuff that the statute changed. The language Lameau was interpreting has never changed. It was moved. I thought Lameau involved the receiver for the district, the sanitation district. And the money was actually paid to the receiver. Well, actually, no. Actually, three times in Lameau, the court says, once the receiver, and therefore the district, the district is the victim, has control of the assets, Lameau must receive credit towards restitution obligation. Therefore, Lameau must be credited for all funds that he transfers to the district care of the receiver. Clearly, the Lameau court saw the receiver and the victim as being equivalent. Three times they say, this is on page 1020 to 1021 of the federal reporter. So there's no difference there. And it's not like the receiver could keep the money. Anyway, that's all I have. Thank you for your patience. Thank you to both counsel for your briefing and argument in this interesting case. This matter is submitted.
judges: TALLMAN, OWENS, VANDYKE